The case for argument today is 2018-2220, Nevro v. Boston Scientific. Ms. Maynard, please proceed. Good morning, and may I please report, Deanne Maynard for Nevro. I'd like to reserve five minutes. The district court misapplied the law to three sets of claim terms in holding Nevro's system and device claims invalid as indefinite. I'd like to start with the system claims reciting the paresthesia-free limitations. The district court held that this limitation has a clear meaning. They mean does not produce sensation usually described as tingling, pins and needles, or numbness. And the patents teach the signal characteristics for providing that paresthesia-free therapy and for providing traditional paresthesia-based therapy. So at Appendix 99 in Column 5, starting at Line 6, there's an entire section of the patent called Representative Therapy Parameters. And it discusses a study that Nevro did first providing patients with the traditional paresthesia-based therapy, and it describes the signal parameters and characteristics used in that. And that starts at Line 34 in Column 6. And it has a paragraph about the signal characteristics. And then it goes on to say, after that portion of the study, it describes the paresthesia-free therapy that was provided. An entire study population of patients and the signal characteristics that were used to do that. And in Column 9, it shows that the patients preferred, 100% of the patients preferred the paresthesia-free therapy. So the intrinsic record teaches a person of skill in the art both how to get the paresthesia-free therapy and what's not paresthesia-free therapy. Can I just ask you, I mean, on the method claim, for example, your position is that you run through the method, and if the patient doesn't tingle, then you know you've practiced it. None of which depends on any advanced knowledge of the, I guess everybody calls them parameters, but the frequency, pulse width, and current. Why, with respect to the system claim, does one need to know anything in advance about what signals will do this as long as you test the system? And sometimes it produces non-tingling therapy. So it's a system for doing that. That's our position is that that's right. As the system claims, the system claims a signal generator that produces this paresthesia-free therapy. And as long as it does so, then it is an infringing system. And that's where the district court went awry because it thought that if at times a system perhaps would not provide the paresthesia-free therapy, then it wouldn't be infringing. But that's not the way one measures system claims. And I would take issue, I don't want to tread into their cross-appeal on my opening, but we do think that, although we agree with the district court, there is lots of guidance in these patents that a person will know in advance, both when they're practicing the method and when they're designing the systems, exactly what they need to do and what kind of system it is. And the extrinsic record confirms that. Never did an FDA-monitored study in which 100% of the patients in the paresthesia-free therapy arm received paresthesia-free therapy. And the study was premised on the notion that one arm of the study received the paresthesia-free therapy and another arm did not. Can I, since time is short, can I ask you to talk about the configured to generate a therapy signal, which I find the most challenging of the issues. First of all, at a more doctrinal level, before getting into the specifics, what, in your view, is the relationship between the difficulty of deciding between two possible claim constructions and the indefinite standard of novelists? So the Supreme Court rejected the view that as long as there were two reasonable readings, the claim was indefinite and said instead the question is whether or not, as you know, a person has skill in the art. Right, but this is to some extent the reverse. As I read the district court opinion, or let's assume I read the district court opinion to say, I find basically that this claim construction question is so perfectly, evenly balanced that I can't find a reason to think that one construction is better than the other. Why is that not a basis for concluding indefiniteness? Well, here it's not because I would like to fight the premise, right? Okay, but in this court, where this court has found indefiniteness, where that's the situation of very different facts than this, like in Teva, where there's a measured quantity and the patents and prosecution history and the intrinsic record give no guidance, in fact, in Teva, conflicting guidance on the exact same indefiniteness question. There's nothing like that here, Judge Toronto. Here, in fact, the district court's discussion of the term that's at issue, which is signal generator configured to generate or deliver, when he was discussing that term, he recognized that the record pointed only in one direction, and that was in the direction that it needs design to. And that is the ordinary meaning, as this court has recognized, of configured to. So where the judge concluded there was conflicting... I thought the district court found evidence, in his view, going both ways, and that's why he found it indefinite. He didn't only cite the evidence that supported your preferred construction of configured to. But my point, Judge Chen, is when he was pointing to the other evidence that he thought pointed away from our construction, he was looking at different terms in different kinds of claims, like method claims, and not looking at the term that's at issue, signal generator configured to generate or deliver. And especially in a word like configured, or configured to, which takes its meaning, it's a connector word, takes its meaning from the word surrounding it, the context is key. So, I guess, following up on Judge Toronto's doctrinal question, I guess you agree then, or your understanding of the law is, if there are two equally strong understandings of a claim term, two competing understandings that are on balance equal, then, therefore, the claim term is indefinite? I don't think this court has held that. I thought you were suggesting Teva was something like that. I think Teva is stronger than what you just articulated, Judge Chen. I think in Teva there were conflicting prosecution history answers. There were three possible measurements. Everybody agreed. The range depended on which measurement was chosen. The claim scope would turn on which measurement was chosen. The prosecution history did something like this. There were two indefinite rejections, the same indefinite rejection, and at one point the patent applicant answered molecular MW, and at one point MP. So that was conflicting. That's a direct, conflicting, irreconcilable answer, and a person of skill in the art needed to know what that claim term meant to measure the range quantities. That's nothing like this case here. Every time the patent uses the words, signal generator configured to deliver, it's talking about the kinds of parameters, the signal parameters that need to be available to the user to select to program when using the device. Your brief said something about how configured to, in this instance, means designed to. And I'm still wondering what does that mean exactly. What is it that the inventors here have done to a signal generator that configures it to generate a paresthesia-free therapy signal? In your understanding of configured to meaning designed to. So just to be clear, this court has said that it has equated configured to with designed to in at least three cases, aspects, man, mission, interface, and GNLE. Right, and that to me is actually a different problem for you, but let's get to my question first, and then we'll get to what you just triggered me will be in the follow-up question. What the patent teaches and what the patents claim with the signal generator is one that's configured to generate, so making the certain signals available to the user to select in the product as finished, but not what BSC would like, which is that the actual parameters are already chosen. Let me, I just want to understand, what is it that the inventors here from never did to configure the signal generator? Let's, I assume we're just talking about a pretty standard signal generator, and now the claim says, let's configure that signal generator to generate a paresthesia-free therapy signal. So what is that action that the inventors have undertaken to accomplish the configuration? They've created a signal generator that allows the user to select the parameters of signals described in the claims. And when you say they created, they created, what is it specifically that they created? They implemented the ability to choose those signals on a signal generator, and the evidence shows it took BSC months and months to take their signal generator and change it into the signal generator that would produce the claimed device. And that's what configured to means in this context. I guess the other side is saying that your understanding of signal generator configured to really at bottom is nothing more than a prior art signal generator. And then the prior art signal generator ultimately is programmed, i.e. parameters are selected, amplitude, pulse width, all of that. But that programming step, of course, is not what you think configured to means. And so I'm just trying to understand to what degree is the other side correct that at bottom your understanding of signal generator is a ready-made prior art signal generator that can then be programmed later on? Well, so I think there's a spectrum, right? And at times they want, for prior purposes, to say that what we're claiming is just a signal generator whose hardware, software, and firmware could potentially be changed completely to make it into the claimed invention. And on the other end they want to say, and the user's already selected the signal parameters for the signal. But what we're saying is, no, it's a device that allows the user to select to make the selection at the end and the device as finished where a user can't modify the hardware, software, or firmware, but it's provided to the user in such a way that they can practice the claimed parameters. Would it be a fair summary to say that a signal generator configured to generate the desired signals if with merely a selection by a user among presented choices it will do so when powered on? Well, it could. So it builds in the idea of presenting the user, the surgeon or the attendant or whoever. Often the company representative. Let's call it. It's often the company representative. But let's call it a menu of options. I don't mean a specific menu. It could be three knobs or something. But the only thing that stands between the generation of this, having the device in there and the generation of the signal is turning the power on and punching in or selecting the three, say, parameters that are discussed in these briefs. Assuming, right. It's like programming a VCR. It comes and you can select the parameters that are allowed, and it is different from the prior edition. It took them months and months and months to develop. Does the patent actually describe doing things to the signal generator to make it ready for user input choice? It talks about the parameters that need to be available to perform. That's the representative therapy parameters that I was discussing earlier. Is the material down at the bottom of column three, top of four that talk about setting the thing up before the inputting of the parameter values? And then it talks about the user selecting, like lower down in column four. Judd Tronto likes starting at line 40 where it talks about a practitioner can use the external programmer to vary the modulation parameters provided to the signal delivery element. So, in other words, input the parameters. It's set up for them to input the parameters. But just to follow up, I'm just curious. Is there any other action that is a precursor to the programming, whether it's an external programmer, a physician programmer, a patient programmer? Is there some other precursor act or step that this patent discloses that might be understood as something where the inventors are configuring the signal generator? Yes, because they're making the – they're configured to. So it's a past tense, and we are taking account of the past tense. As provided, as made, the signal generator allows a user to select these particular parameters. And we know it's not, Judge Chin, what BSC wants it to be, which is the already programmed, because there's an independent and a dependent claim that where the only added limitation is programming the signal generator. And that makes clear that they're not the same. That's – Right, but – The H42 patent claim, is that what you're talking about? Yes, Your Honor. Yeah, I wasn't quite sure – 1821. Right. I wasn't quite sure about that, because 21 has an and in it, right? It's also configured to do two things. The second thing is the and delivered the signal, which it seems to me is not necessarily already incorporated in Claim 18, so that it – I'm not sure you need this argument, but it seems to me you may have overstated the point that there is no difference between that dependent claim and its independent claim, except for the punching in of the values. Well, I take your point about the and, but I still think the point stands that the signal generator in Claim 18 is not already programmed. Can I ask you just a practical question? I was just trying to think. Maybe you can answer this or not, but the difference between these two positions on the Configure 2 seems to me to be whether an accused infringer, the device manufacturer, is by selling the device directly infringing or by making the device, is then and there directly infringing. Or on the other hand, the company representative in the operating room is the one completing the device. Why, as a practical real-world matter, should that make a difference to you as patent owner? Either way. Assuming instructions, right, to do it, so that why is an inducement case not pretty easy? Well, and I think actually it's actually direct infringement by the company representative who's finishing the device. Right. It's the same person. Yes, I agree with you. We will have an infringement case either way. We think the correct construction is ours, but we will have an infringement case either way because if in their theory the company representative is completing sort of a tailor-made device at the bedside. I was just wondering along those same lines, is it possibly too late for you to make those inducement-related claims? Well, we've made inducement claims. If we were to deviate on the claim construction and include programmed, you haven't made a claim, have you? Did you make an inducement claim? We included inducement claims in our complaint, Your Honor. Okay. The court held configured to make these patent claims indefinite, so they didn't reach infringement device claims at all. I've already run out of my time. Yeah, we'll restore some of your rebuttal time. Okay. Mr. Wolfe. Thank you, Your Honor. May it please the Court, Matt Wolfe for Boston Scientific. Judge Toronto, if I may begin with your question about paresthesia-free, I recognize a lot of the discussion was about configured to, but I don't want to lose the heart of the paresthesia-free argument. Nevro told the patent office, and this is at A12574, that the high-frequency stimulation such as claimed by applicant may or may not cause paresthesia. I accept your question, Your Honor, as a possible construction of paresthesia, but Nevro specifically rejected that construction, the capability, the possibility of a paresthesia-free treatment. They specifically pushed back against that understanding at the patent office to get the patent in the first place. So, for example, we have Mr. Thacker, who was an employee of Boston Scientific and then left for Nevro. I'm sorry, what page in the appendix did you say that was at? A12574. Do you know what volume that is? It's a one-paragraph summary, it's an invention summary. I can pull it up right now, Your Honor. Volume five. That's where 12574 is. Volume five. So if you look maybe six lines down, Your Honor. In the underlined material? Yes, Your Honor. One, two, three, four, five, six. Applicant further argued that high-frequency stimulation such as claimed by applicant may or may not cause paresthesia, and thus it would not be inherent that high-frequency stimulation would necessarily achieve pain relief. I guess I don't see how that contradicts the capable of argument. And my understanding was that the whole point of this is that high-frequency alone doesn't necessarily get you paresthesia-free. It's also the amplitude and pulse width submodulation. So I don't see what you get out of this sentence. The point, Your Honor, and I apologize, I wasn't being clear, is at A7811 this is admitted. Nevro acknowledged that the problem. You're taking us somewhere else? It's the same notion, Your Honor. Where do you want me to go now? I'll just stick with what we have just so we don't jump around. The prior art, including our devices, Boston Scientific devices, was capable of providing paresthesia-free treatment. That sometimes it did and sometimes it didn't. And this was presented as a ground for rejecting the claims. And Nevro said no, because it sometimes does and sometimes doesn't, it doesn't anticipate. But they then didn't complete the sentence. They then didn't say, and here's the secret sauce, here's the magic formula, here's the combination of parameters that will always, almost always, typically, pick whatever adjective you want, create paresthesia. So that's why I don't want to give up on this paresthesia-free argument, Your Honor. It's that this was critical to patentability, the notion that the prior art devices that had precisely the same technical capabilities, that because they didn't always create, they didn't inherently create, sometimes they did, sometimes they didn't, create paresthesia. So therefore... Doesn't the specification here talk about, we want the frequency to be within this range, we think the amplitude should be in this other range, you can have different kinds of duty cycles? There's some guidance and details in the specification that get you to where they want to get to. Isn't that true? Respectfully, no, Your Honor, because the passages that counsel was pointing to primarily, we're talking, and there are charts and tables and diagrams, those are all about whether the device alleviates pain. The statistics, the numbers, are all about whether or not it alleviates the pain. The paresthesia point here is one paragraph at the end of that chain that says, and lots of people felt paresthesia-free. They didn't tell us at what number, what kilohertz, at what amplitude, at what number you're likely to trigger the threshold. We have, again, this is Mr. Thacker. This is at A12017. Specific details of the sensations vary patient to patient. Patients can feel paresthesia at frequencies above 2,500 hertz. And, of course, the typical range of the patent is 1.5 and above. So they're telling the patent office, doing a bit of a soft shoe, just because the prior art devices could provide these parameters, unless you show that they actually did it, they actually provided paresthesia-free treatment routinely, they're not invalidating. But then they don't tell us in the patent what, as I said, the secret sauce is, what the algorithm is. So that's why, Your Honour, Judge Taranto, I wanted to push back a little bit, because I think this is an important point. Most of the claims are structured. Here are frequencies or amplitudes, depending on the complexity of the claim. None of that's new. We have their own expert admitting at A8666 that never did invent neurostimulation, SCS, a new lead, or even an IPG. The asserted claims rely on known hardware components. So all the numbers in the claims are from known hardware components. What's supposedly new is paresthesia-free. Well, then tell us, with at least rough numbers, what gets us to paresthesia-free. And what His Honour found below, and what's subject to clear error review, is that you can't do that. It's patient by patient. Just like Halliburton, just like Geneva. So with that, unless you have other questions, I'll turn to the configured tool sheet. In Geneva, this Court said, effective amount of the composition is, although sometimes you're not going to know until after you do the treatment, that's a classic way of writing claims, and we don't worry about that on the definiteness equation. That's 100% correct, Your Honour. What we have here is an anti-effective amount claim. What Geneva said unambiguously is, we're going to allow a certain level of experimentation. It almost kind of bleeds into an enablement analysis. It uses the phrase, undo experimentation. If we can figure out what the parameters are, what the claim scope is, without undue experimentation, we'll let you keep the claim. But here we have Nevro telling the Patent Office, for a very important reason, time and time again, we can't tell you what that is, before the fact or after the fact. This isn't a situation where we're coming in here and we say, well, you have to perform this procedure on five patients to figure out what the proper dosing is, what the proper signal parameters are, what they said over and over again to the Patent Office, and what Judge Chabria found, and again is subject to a clearer review, is you can get as much information as you want, patient to patient to patient. It doesn't tell you as to the next in line, are you going to get paresthesia free or are you not going to get paresthesia free. Can I just ask, why does that matter? Because that's exactly what... I guess I'm thinking particularly of the method claims. I mean, I would have thought that there have been a fair number of patents over time that say here are some sort of objective conditions and then they say we're in and they state an effect. Why, in your view, would those we're in clauses about effects have any meaning at all? Because either it always has that effect or it would be invalid. Your Honor, you're absolutely right. I could imagine method claims written to these concepts that would not fail the indefiniteness required. At the end of the day, we think they're all invalid under 102, but putting that aside. But the method claims here are not really traditional method claims. I mean, if we look at Claim 1 of the 102, it has three things. It has a signal VO lead, it provides a treatment at 1.5 to 50K, and, quote, does not create paresthesia, end quote. That's the entirety of the method claim. So I want to use those parameters, because my prior art device can provide 1.5K to 50K, but I don't want to do paresthesia. I don't want to infringe. From patient to patient to patient. Right, so you can't know in advance, for sure. What is it about... Maybe I'll ask it this way. I'm sorry, Your Honor. I gather that pre-Nautilus we had a number of cases that said you don't have to know in advance. Do you think Nautilus changed that? It did, at least at the broadest level. And we argued this in a brief, Your Honor. It did. There's still the Nautilus notion of avoiding the trap of uncertainty. Avoiding... Effectively, what they've done by writing these method claims is monopolize not just paresthesia-free treatment, but paresthesia treatment. So if I want to have a treatment with paresthesia, because I have a patient that prefers a numbing to that weird kind of nothing feeling, I can't perform the method at the risk of being paresthesia-free. Just to be clear, you just called it a weird kind of nothing feeling. Let me understand the technology. You can have tingling and pins and needles, or you can have nothing, and you think the weird one is the nothing? There are patients that, if you've lived your whole life with back pain, and then this... There are patients that prefer paresthesia to non-paresthesia. The studies have shown. And there are certainly patients that presented with the option of lower frequency and paresthesia and thus far less frequent battery recharging. The studies have shown. I mean, this is in our brief. That patients, many patients, prefer that. Could I ask you to move on to... Yes, Your Honor. Yes, Your Honor. And here, this very discussion we're having was had in the prosecution of this family of patents. On configured to... Yes, Your Honor. This dovetails back, I'm sorry, to paresthesia-free. Yes. If we were to construe configured to mean programmed to, then wouldn't that take care of your indefiniteness concerns about paresthesia? Because what will... The claims will all mean then that you've essentially customized the signal generator in such a way for a given patient to produce a paresthesia-free therapy signal outcome. And then if that's the case, then you know you're infringing or not infringing because you've now designed and customized and altered the parameters in such a way that you are yielding a paresthesia-free signal. Your Honor, there are... One can envision claims where that would be the result, but with these claims as written, if I am doing an iterative process with the patient, that first signal that I give them, if it is paresthesia-free by blind luck, I've now infringed their patent. Even though they haven't told me that that signal is or is not likely to cause paresthesia, I know as a factual matter from their own witnesses that it may or may not cause paresthesia. I'm rolling the dice. I could set out to be in the 1.5 to 2 kilohertz, therefore battery-saving range, and say I don't want to even risk... No paresthesia-free. I'm willing to accept the tingling in exchange for the battery. If that first time I plug that in, that's paresthesia-free, they've got me for infringement. So the way they've written their claims, it's a crap shoot. It's a roll of the dice. Well, go ahead and explain why configure 2 means program 2. Well, in fact, we have, and this is at A12929, in the 405 application, which is the exact same spec as the 533 patent, the patent office said configure 2 means at least one instance of actually programming. Actually programming. Then they go on a sentence later and use the phrase actually configure. We see claim language, like claim 1 of the 125 patent at 148, where it says a step for configuring the signal generator, including programming. So the notion that programming is part of configuring is replete. And the position that they're taking today... And let me be... Can I take one step back? I know this isn't directly to your question. We're very concerned about this design 2 construction because it's meant two entirely different things. The gloss they put on design 2, and at pages 35 to 37 of our opening brief, we have a long colloquy about this. Design 2 below meant some kind of subjective intent. Right. Now, let's assume that that's been abandoned and abandoned without difficulty. And that it really does mean presenting, setting the thing up so that you present choices to the administrator. And once those choices are made about the parameters to put... what values to set the parameters at, and the power is on, it does what you say it's supposed to do. In the prosecution history, in the claim language, we believe the much better reading is that programming has to be part of configuring. In order to be configured, ED, you have to be programmed, ED. And we obviously didn't do that. We didn't program in advance. Now, you're right. If we're playing games with our salespeople in the field, they have inducement claims and all that, but they said to the patent... Or even direct infringement if they actually are your salespeople. Yes, but they unambiguously said to the patent office that actually configured is what this means. That at least one instance of actually programming, I mean, that's the patent office's own words. It wasn't rejected. They got the claim actually programmed. That's not this patent, right? But it's this specification, Your Honor. It's the 533 specification, the same spec. But you're right, it's not the same spec. But clearly when you're talking about language in the same spec, I think this Court has felt... I mean, it's not without exception, but certainly it's fair for us to read that same discussion. And this is the passage in which the examiner said, I don't like what you have. Here's my suggestion. They said, no, we don't like that suggestion. We have an alternative. How do we make... And then it was rejected again by the examiner, and then they didn't push back on that. So you're right, there were two steps, Your Honor. But the second time the examiner said, no, no, I need actual programming to allow this claim. They accepted that and took the claim. But we don't even have to go there. I mean, claim 1 of the 125, when it says, a step for configuring the signal generator, including programming. That, to me, Your Honor, respectfully, is unambiguous, that programming is a subset of configuring, and therefore if you are configured, you are programmed. That's also the language of the precedent. We cited Intel, we cited Edwards and Fortinet and others, that that just makes sense, that either we're sending it to the customer as programmed or we're not. And if we're not, they have other avenues. So this is perhaps a little bit indirect, and I'm not sure the parties cited the Core Wireless case. You know that case? I'm familiar, but I don't recall it. It's a case in which I think, in the course of your opinion, maybe this has, I forget what the language was, maybe adapted to or something, in which the term was, it was explained that the term meant, among other things, configured to, and the analogy made was to, like, a three-gear gearshift in a car. And the car is configured to operate in gear one. It's also configured to operate in gear two, and it's configured to operate in gear three. And I think the opinion says expressly, if the claim is configured to operate in gear one, it doesn't matter that it can also be operated in the other one, and it's configured that way even before the driver pushes it into the correct place. Why is this not like that? I recognize that, Your Honor, and this is somewhat an exercise in line drawing, right, because how, and Finjen kind of hovers over all of this, and it's, but when we sell a device that a commercial user can't take and put at in the claimed range, and they say, and they infringe, they argue that kind of device until a month before the summary judgment hearing when they realized they were on the, between Scilla and Charybdis of 102 and infringement. They were arguing that was infringing under their definition of design two, where literally we had put a screen that blocked out a commercial user from going into second gear or third gear or fourth gear. So that's why we're kind of angels on the head of a pin, Your Honor, and I apologize, but there's a back story to what was accused for the back story. Sometimes, you know, you actually get through Scilla and Charybdis. Yeah, I guess that's true, Your Honor. I am well into my red light time, Your Honor. All right, thank you, Mr. Wolfe. Ms. Maynard will restore your rebuttal time. Go ahead and give her five minutes. Thank you very much, Your Honor. First, this is not blind chance. The patents describe and teach how to provide this therapy, and the extrinsic record shows that BSC did it in its own study where hundreds of patients where it said one arm was paresthesia-free and one arm was paresthesia-based. So what are your strongest specification passages for giving a skilled artisan a clear window into how to achieve a paresthesia-free therapy signal? So starting at column 6 in A99 at line 51, the patent describes the study that Nevro did, and it gives the 3 to 10 kilohertz, and in particular cases, it tells you where to place the leads. It gives you the kilohertz. It tells you the amplitudes, the duty cycles, as Your Honor mentioned, and the amplitudes at the top of column 7, line 1 and 2. Does this study connect to a paresthesia-free outcome? Yes, Your Honor. So if you go to column 9, the patent makes clear that the patients all preferred, every one of the tested patients preferred the presently disclosed therapy to standard C, so that implicitly suggests they received paresthesia-free therapy, and we know they did from the extrinsic evidence because this is the study that the FTC monitored, and in that study, the report was that 100% of the patients in the paresthesia-free arm received paresthesia-free therapy. So it isn't the case. Can I get you to turn to the Configure 2 construction? Yes, I'd be happy to, Your Honor. So on Configure 2, the part of the... Maybe as part of that, can you address the reference, I think Mr. Wolf said, your expert testified that, I forget what the phrase was, known hardware components were used. Am I remembering that right? So that the signal generators are known in the art, but this is the combination, that the patent is the signal generator that allows a user to select the novel therapy that's described and claimed in the patent, and that's obviously not unusual. The part that you were discussing with him in the prosecution history, Your Honor, at A12929, that... So as Your Honor noted, we expressly declined to agree to amend the term that's closest to what's at issue here, and the last sentence of this description makes clear that... So it's about the programmer. Wherein the programmer is configured to transmit, and effectively, two signals, the examiner agreed that a programmer was so configured, even if the user didn't select both signals. So to your car hypothetical, it's like it allows first and second gear, and it would still be configured to do that, even though only second gear is chosen. That's completely consistent. It's a different claim language and different claim, but it is consistent with our argument. On his claim on patent 125, claim one, that that method claim there, that configuring, comma, including programming, that actually shows that programming and configuring are not equated. Which one? He was pointing at 125... A bunch of claims. Oh, okay, yeah. So it's a method claim that talks about configuring a signal generator, comma, including programming, and that actually shows that programming and configuring... I mean, we don't think that claim is what you should look at, because it's not the same claim term, it's a method claim, not the signal generator configured to generate, but even if you look at it, it debunks the notion that configuring is equated to programming, otherwise that including step would kind of be superfluous. Well, but the word equated I don't think quite captures the point. I think his point is that configuring is not complete until the last step, which is programming. And that's what that language, their argument is, tends to support. But if configuring... The district court thought that it showed that programming in that context was equated with configuring, and obviously if the signal generator were already... If a configured to signal generator were already programmed, the including programming would be superfluous. Okay, thank you, Ms. Mayer. We thank both counsel. This case is taken under submission.